UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| THE ESTATE OF TROY WINSLOW, by and through its Administrators, Jessica Adams and Tony Winslow; JESSICA ADAMS, individually; TONY WINSLOW, individually, | * * * * * * | |
| Plaintiffs, | * * | |
| v. | * * | Civil Action No. 26-cv-10564-ADB |
| TRISTON CHAMPAGNIE; MATTHEW FARLEY; CHARDEEZA COLEMAN; BOSTON POLICE DEPARTMENT; CITY OF BOSTON; | * * * * | |
| Defendants. | * * | |

**<u>MEMORANDUM AND ORDER</u>**

BURROUGHS, D.J.

The Estate of Troy Winslow, a teenager killed in a car crash following an encounter with

Boston police officers, and his parents, Jessica Adams and Tony Winslow (collectively,

"Plaintiffs"), bring this civil rights action against three Boston police officers, Triston

Champagnie ("Champagnie"), Matthew Farley ("Farley"), and Chardeeza Coleman

("Coleman"), as well as the Boston Police Department and the City of Boston (together, the

"City"). [ECF No. 1-1 at 8–28 ("Complaint" or "Compl.")]. Before the Court are the City's

partial motion to dismiss five of Plaintiffs' nine claims against it, [ECF No. 10], and Coleman's

motion to dismiss all of Plaintiffs' claims against her, [ECF No. 23].  For the following reasons, both motions are **GRANTED**.

## I.      BACKGROUND

### A.      Factual Background

The following facts are drawn from the Complaint.  For purposes of this motion, the Court "accept[s] as true all well-pleaded facts alleged in the complaint and draw[s] all reasonable inferences therefrom in the pleader's favor."  Lawrence Gen. Hosp. v. Cont'l Cas. Co., 90 F.4th 593, 598 (1st Cir. 2024) (quoting Lanza v. Fin. Indus. Regul. Auth., 953 F.3d 159, 162 (1st Cir. 2020)).

On January 4, 2024, at approximately 3:00 a.m., four teenagers, including Troy Winslow ("Winslow"), were driving in a silver Hyundai down Morton Street in Mattapan, Boston, Massachusetts.  [Compl. ¶¶ 14–15, 19].  Winslow, who was getting a ride to his home in Dorchester, Massachusetts, was seated in the backseat.  [Id. ¶¶ 15–16].  Another teenager was operating the vehicle.  [Id. ¶ 15].  Plaintiffs allege that the Hyundai was not being driven erratically, was not speeding, and was stopping at red lights.  [Id. ¶ 20].

Champagnie and Farley were on patrol nearby in an unmarked police cruiser.  [Compl. ¶¶ 18–19].  As the Hyundai drove down Morton Street, Champagnie and Farley initiated a traffic stop.  [Id. ¶ 19].  They later stated that they initiated the stop because the vehicle's occupants, who were wearing balaclavas, "did not match the registered owner," which they stated led them to believe the Hyundai was stolen.  [Id. ¶ 22].  Champagnie and Farley did not, however, report the suspected car theft via radio dispatch, although Champagnie did say via radio dispatch that the Hyundai was suspected of "'just a VAL' or a Violation of Auto Laws."  [Id. ¶ 38].  Champagnie later stated that he observed the occupants' "'excited' facial expressions" during the

traffic stop. [Id. ¶¶ 22, 39]. Plaintiffs allege that one of the pursuing officers knew that the occupants of the Hyundai were "juveniles." [Id. ¶ 112].

The Hyundai initially pulled over on the side of the road as directed. [Compl. ¶ 21]. When Champagnie and Farley got out of the cruiser, however, the Hyundai "re-entered the lane of travel." [Id. ¶¶ 21, 24]. The officers commenced a "full vehicular pursuit," activating the lights and sirens on the unmarked cruiser and "traveling at a high rate of speed." [1] [Id. ¶ 24]. Coleman, who was nearby in a marked police vehicle, quickly joined the chase, following close behind Champagnie and Farley. [Id. ¶ 28]. Shortly after the chase began, Sargeant Kyle Gomes ordered the pursuing officers via radio dispatch to "disengage their pursuit." [Id. ¶¶ 26]. When Gomes requested confirmation that there were no vehicles pursuing the Hyundai, Champagnie replied, "correct, not pursuing." [Id. ¶ 27]. After Champagnie told Sargent Gomes that he was "not pursuing" the Hyundai, his body camera captured the "audible acceleration" of the unmarked police cruiser and the sound of Farley activating the emergency lights and sirens. [2] [Compl. ¶ 27]. Coleman "similarly ignored" Gomes' order to disengage after stating that she was "turning around." [Id. ¶¶ 28, 40]. Traffic cameras captured the unmarked and marked vehicles pursuing the Hyundai through multiple red lights. [Id. ¶ 27]. Plaintiffs allege, "upon opinion and belief," that Champagnie and Farley's vehicle exceeded 90 miles per hour, [id.

---

[1] Plaintiffs allege that Boston Police Department policy prohibits unmarked police vehicles from engaging in high-speed pursuit. [Compl. ¶ 25]. An officer in an unmarked vehicle may track a "suspicious vehicle," but must inform other "marked units," who may engage in pursuit if appropriate. [Id.]
[2] Champagnie and Farley stated that their body cameras were turned off during the initial traffic stop. [Compl. ¶ 21]. The Complaint does not specify when the cameras were turned back on. Coleman claimed that her body camera was "inadvertently" turned off while pursuing the Hyundai, but that she turned it back on following the crash. [Id. ¶ 43].

¶ 29], while Coleman followed closely behind Farley and Champagnie "at a high rate of speed," [id. ¶ 40].

The Hyundai then struck a pole on Morrissey Boulevard and rolled over multiple times. [Compl. ¶ 30].  Upon witnessing the crash, Farley whispered, "[t]here are kids in the car."  [Id. ¶ 31].  Immediately after the crash, Champagnie told Farley to "cut-it off" and shut off his own body camera briefly.  [Id. ¶ 43].  Champagnie allegedly began pacing and yelled, "Jesus fucking Christ," [Id. ¶ 33].  Farley approached Winslow, who had been ejected from the vehicle and whose arm had been severed from his body, and attempted to administer aid.  [Id. ¶¶ 32–33]. Winslow was pronounced dead at the scene, and his body was left in the middle of Morrisey Boulevard.  [Id. ¶ 33].  Two of the other occupants later succumbed to their injuries.  [Id. ¶ 35]. The fourth occupant emerged from the vehicle in tears and was "left unattended" until a Massachusetts State Police Officer "pulled him to safety."  [Id. ¶ 34].

At some point, Champagnie's brother, Officer Patrick Champagnie, Jr., and his father, Sargeant Patrick Champagnie, Sr., arrived at the scene.  [Compl. ¶ 41].  Body camera footage from the night of the incident captured the officers discussing "possible wrongdoing" and requesting to "to get in touch with union representatives."  [Id. ¶ 42].  They repeatedly "warn[ed]" each other that they were "rolling" or "hot," apparently referring to the fact that their body cameras were in operation.  [Id.].  Plaintiffs also allege that Coleman stated that she inadvertently turned off her body camera but later realized the mistake and turned it on.  [Id. ¶ 43].

The surviving occupant of the Hyundai provided officers with Winslow's full name at approximately 4:30 a.m. the morning of the incident.  [Compl. ¶ 53].  Tony Winslow and Adams reached out to the Boston Police Department on the morning of January 4, 2024 when they

4

awoke and realized their son was not at home.  [Id. ¶ 53].  Officers met with them at approximately 11:00 a.m. that morning, requested Troy Winslow's dental records, and confirmed that Troy Winslow "probably definitely" died in the crash.  [Id. ¶ 54].  Troy Winslow's parents were not permitted to view his body despite "endless" requests.  [Id. ¶ 54].

Plaintiffs claim that Champagnie had a history of misconduct preceding the crash, including an alleged illegal search and an incident where he accidentally discharged his firearm into a neighbor's wall.  [Compl. ¶¶ 47–49].  At the time of the crash, Champagnie was under investigation for the accidental discharge, but remained on active duty, [id. ¶¶ 48, 52], and was still listed as "eligib[le]" for the Massachusetts State Police until at least September 2024, [id. ¶ 50].  Following "public pressure," he resigned from the Boston Police Department in August 2025 with "charges pending."  [Id. ¶ 51].  There have been no public announcements regarding changes to Farley and Coleman's employment status or disciplinary measures taken against them.  [Id.].

Plaintiffs allege that the City and the Boston Police Department failed to make the details of Champagnie's disciplinary record accessible to the public or to the families of the victims of the crash on January 4, 2024.  [Compl. ¶ 46].  They claim that it has been "nearly impossible" to obtain details of the internal investigation.  [Id. ¶ 51].  Troy's parents have suffered a variety of physical and emotional symptoms following Troy's death, including nightmares, ulcers, sleep impairment, relationship problems, and fluctuations in weight and appetite.  [Id. ¶¶ 57–58]. They have four remaining children, three of whom are disabled, for whom Troy served as a

caretaker and source of emotional support. [Id. ¶¶ 59–60]. One of the younger children was hospitalized for psychosis and suicidal ideation in the wake of his brother's death. [Id. ¶ 60].

### B.    Procedural History

Plaintiffs commenced this action in Massachusetts Superior Court on December 5, 2025, asserting various tort claims and claims under 42 U.S.C. § 1983 against Defendants. [Compl. at 6, 19–27]. On February 4, 2026, the City, the only defendant who had been properly served in the Superior Court, removed the action to this Court. [ECF No. 1]. Following the City's removal to the United States District Court, Plaintiffs voluntarily dismissed their claims against the Commonwealth of Massachusetts. [ECF No. 9]. Plaintiffs filed proofs of service as to all remaining defendants. See [ECF No. 19]; [ECF No. 20]; [ECF No. 28].

On February 20, 2026, the City filed its motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6), seeking dismissal of Plaintiffs' claims for intentional infliction of emotional distress, loss of consortium, and their claims under 42 U.S.C. § 1983. [ECF No. 10]. Plaintiffs opposed the City's motion on March 14, 2026. [ECF No. 17]. Coleman filed a motion to dismiss all claims against her on April 1, 2026, [ECF No. 23], which Plaintiffs opposed on April 21, 2026, [ECF No. 27].

## II.    LEGAL STANDARD

In reviewing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court must accept all well-pleaded facts as true, analyze those facts in the light most favorable to the plaintiff, and draw all reasonable factual inferences in favor of the plaintiff. See Gilbert v. City of Chicopee, 915 F.3d 74, 80 (1st Cir. 2019). "[D]etailed factual allegations" are not required, but the complaint must set forth "more than labels and conclusions," Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007), and must contain "factual allegations, either direct or

inferential, respecting each material element necessary to sustain recovery under some actionable legal theory," Gagliardi v. Sullivan, 513 F.3d 301, 305 (1st Cir. 2008) (internal quotations omitted) (quoting Centro Médico del Turabo, Inc. v. Feliciano de Melecio, 406 F.3d 1, 6 (1st Cir. 2005)).  The alleged facts must be sufficient to "state a claim to relief that is plausible on its face."  Twombly, 550 U.S. at 570.

"To cross the plausibility threshold a claim does not need to be probable, but it must give rise to more than a mere possibility of liability."  Grajales v. P.R. Ports Auth., 682 F.3d 40, 44–45 (1st Cir. 2012) (citing Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)).  "A determination of plausibility is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'"  Id. at 44 (quoting Iqbal, 556 U.S. at 679).

## III.    DISCUSSION

In the Complaint, Plaintiffs assert nine claims against the defendants: negligence (Count I); negligent training and supervision (Count II); wrongful death (Count III); intentional infliction of emotional distress (Count IV); negligent infliction of emotional distress (Count V); loss of consortium (Count VI); and claims under 42 U.S.C.§ 1983 for violations of the Fourth Amendment (Count VII); the Fourteenth Amendment's Due Process Clause (Count VIII); and the Fourteenth Amendment's Equal Protection Clause (Count IX).  [Compl. ¶¶ 64–123].

### A.    Claims Against Coleman

Coleman moves to dismiss all claims brought against her individually.  [ECF No. 23]. Plaintiffs oppose dismissal of their § 1983 claims (Counts VII–IX) and intentional infliction of

emotional distress claim (Count IV), but do not oppose dismissal of their negligence or loss of

consortium claims (Counts I, III and V–VI).  [ECF No. 27].

### 1.       Section 1983 Claims Against Coleman

Section 1983 provides a civil cause of action for deprivation of rights secured under the

U.S. Constitution and federal law.  42 U.S.C. § 1983.  To succeed on a Section 1983 claim, a

plaintiff must demonstrate "(1) conduct by a person (2) acting under color of state law, (3) who

caused (4) a deprivation of the plaintiff's federally protected rights."  Hewes v. Pangburn, 162

F.4th 177, 190 (1st Cir. 2025).  Coleman does not contest that she acted under color of state law,

so the Court turns to the "precise constitutional violation[s] with which [the defendant] is

charged."  Baker v. McCollan, 443 U.S. 137, 140 (1979).

### i.       Illegal Seizure (Count VII)

Coleman first seeks dismissal of Plaintiffs' claim alleging an illegal seizure under the

Fourth Amendment.  The Fourth Amendment guarantees citizens the right "to be secure in their

persons . . . against unreasonable . . . seizures."  U.S. Const. amend. IV.   In the absence of

physical force, a seizure occurs where there is an "acquisition of physical control," involving

"either voluntary submission to a show of authority or the termination of freedom of

movement."  Torres v. Madrid, 592 U.S. 306, 321–22 (2021) (citing Brower v. County of Inyo,

489 U.S. 593, 596 (1989)).

Plaintiffs allege that the officers' continued pursuit of the Hyundai following Sargent

Gomes' order to desist constituted an "unconstitutional seizure" in violation of the Fourth

Amendment.  [Compl. ¶ 107].  Coleman argues that Plaintiffs' Fourth Amendment § 1983 claim

fails because (1) Coleman did not initiate the initial traffic stop or high-speed pursuit; (2) even if

she had initiated the chase, a high-speed pursuit "of the type alleged" is not a "seizure" within

the meaning of the Fourth Amendment; and (3) even if the high-speed pursuit was a "seizure," it would not violate the Fourth Amendment because the officers "sought to terminate a pursuit that posed dangerous risks to others." [ECF No. 24 at 5]. Plaintiffs concede that Coleman did not participate in the traffic stop, [ECF No. 27 at 6], but argue that her participation in the high-speed pursuit constituted an "attempted seizure" undertaken without legal justification, [id. at 7].

Here, binding precedent forecloses any argument that Coleman conducted a "seizure" by engaging in a high-speed pursuit with the vehicle. The Supreme Court has held that "a police pursuit in attempting to seize a person does not amount to a 'seizure' within the meaning of the Fourth Amendment." County of Sacramento v. Lewis, 523 U.S. 833, 844 (1998); see also Horta v. Sullivan, 4 F.3d 2, 10 (1st. Cir. 1993) (no seizure by pursuing officer where fleeing motorcyclist collided with another officer's police cruiser); Willhauck v. Halpin, 953 F.2d 689, 716 (1st Cir. 1991) ("The fact that [plaintiff] was able to drive away from [the officer] at . . . eighty miles an hour belie[s] any assertion that any seizure . . . terminated [plaintiff's] freedom of movement."); cf. Scott v. Harris, 550 U.S. 372, 381 (2007) (seizure occurred because pursuing officer "ramm[ed] his bumper" into fleeing vehicle). Unlike with Champagnie and Farley, who Plaintiffs allege initially stopped the Hyundai without legal justification, Plaintiffs do not identify any conduct by Coleman other than engaging in "a police pursuit in attempting to seize a person," Lewis, 523 U.S. at 844, that they contend was a Fourth Amendment violation. Accordingly, they have failed to plausibly allege the seizure required to state a Fourth Amendment claim against Coleman.

Moreover, even if Plaintiffs plausibly alleged that Coleman violated the Fourth Amendment, they have failed to plausibly allege that she was a cause of their injuries. To

succeed on a § 1983 claim, the Plaintiffs must plausibly allege not only that a constitutional violation occurred, but that the defendant's conduct, "beyond falling within the infinite causal web leading to an injury," was a "legally significant cause." Hewes, 162 F.4th at 190 (quoting Rodriguez-Cirilo v. Garcia, 115 F.3d 50, 52 (1st Cir. 1997)). This causation requirement is "similar to that of ordinary tort law." Id. (quoting Maldonado Santiago v. Velazquez Garcia, 821 F.2d 822, 831 (1st. Cir. 1987)). Under traditional tort law principles, determining causation "requires a court to determine if an injury would not have occurred but for a defendant's negligence, or, in the situation where there are two or more causes, each of which by itself is sufficient to bring about an injury, whether the defendant's conduct was a substantial factor in bringing about the injury." Clement v. U.S., 980 F.2d 48, 54 (1st Cir. 1992).

Plaintiffs argue that unlawful pursuit by "all three officers proximately caused the death of Troy Winslow." [ECF No. 27 at 7]. Coleman's alleged involvement, however, was limited to following behind Champagnie and Farley after the pursuit had already begun. [Compl. ¶¶ 28, 40]. Plaintiffs do not offer any factual allegations to suggest that the high-speed pursuit or subsequent crash would not have occurred absent Coleman's participation. Nor is this a situation of two independent causes "each of which by itself is sufficient to bring about an injury," Clement, 980 F.2d at 54, because Coleman's alleged participation as a "follow[er]" in the chase was causally antecedent to—not independent from—Farley and Champagnie's decision to initiate it. In other words, there are no allegations to suggest that, if Farley and Champagnie had not made the initial decision to give chase to the Hyundai, Coleman would have caused the accident regardless.

Plaintiffs argue that, because the officers' pursuit was motivated by "discriminatory judgments," a Fourth Amendment violation is "plausibly stated." [Id.]. Setting aside for the

10

moment that Plaintiffs have not alleged that Coleman was aware of the occupants' age or race, see [Compl.], they have not explained why her state of mind bears on whether her conduct was a legally significant cause of the alleged injury.  Accordingly, the Court will dismiss Plaintiffs' Fourth Amendment claim against Coleman.

ii.      Due Process (Count VIII)

Plaintiffs' substantive due process claim relies on Lewis, 523 U.S. 833, where the Supreme Court held that a high-speed car chase causing death may constitute a due process violation if the pursuing officer, with a "purpose to cause harm unrelated to the . . . arrest," engages in "arbitrary conduct shocking to the conscience," id. at 836.  [ECF No. 17 at 6–7]; [ECF No. 27 at 5–6]; see [Compl. ¶¶ 114–15].  "The burden to show state action that 'shocks the conscience'" for purposes of a substantive due process claim is "extremely high, requiring 'stunning' evidence of 'arbitrariness and caprice' that extends beyond '[m]ere violations of state law, even violations resulting in bad faith.'"  Burns v. City of Worcester, 772 F. Supp. 3d 109, 132 (D. Mass. 2025) (quoting Melendez-Garcia v. Sanchez, 629 F.3d 25, 36 (1st Cir. 2010)).  "[N]egligence, without more, is simply insufficient to meet the conscience-shocking standard," but allegations that state actors had an "intent to injure . . . unjustifiable by any government interest" are likely sufficient.  Ortolano v. City of Nashua, 680 F. Supp. 3d 70, 80–81 (D.N.H. 2023) (quoting Gonzalez-Fuentes v. Molina, 607 F.3d 864, 880–81 (1st. Cir. 2010)).  "In the circumstances of a high-speed chase aimed at apprehending a suspected offender . . . only a purpose to cause harm unrelated to the legitimate object of arrest will satisfy the shocks-the-conscience test."  Lewis, 523 U.S. at 834.

Coleman argues that she was not aware of the age of the occupants of the vehicle, and secondly, that her "mere involvement in [the] pursuit," [ECF No. 24 at 7], is not sufficiently

11

"egregious" or "outrageous" to "shock the . . . conscience" and constitute a due-process violation, [id.]. Plaintiffs respond that Coleman's conduct shocks the conscience because "Officer Coleman pursued a car known to contain four occupants . . . for miles, at extreme speeds," and "the sole purpose of the Officers' pursuit was to harass or intimidate the occupants of the Hyundai." [ECF No. 27 at 6].

Here, although the Court is doubtful that Coleman's alleged conduct satisfies the "shocks-the-conscience" standard, it need not decide that question, as Plaintiffs do not plausibly allege a causal link between Coleman's conduct and the alleged due process violation. Plaintiffs allege that, after Champagnie and Farley initiated the chase, Coleman joined in pursuit of the teenagers' Hyundai, ignored Sargeant Gomes' order to turn around, and continued to follow Champagnie and Farley up until the crash occurred. [Compl. ¶¶ 28, 40]. For the reasons discussed above, these facts do not suggest that Coleman's participation was a "legally significant" cause of the crash. Hewes, 162 F.4th at 190 (quoting Rodriguez-Cirilo, 115 F.3d at 52). Again, Plaintiffs offer no allegations to suggest that absent Coleman's decision to follow Champagnie and Farley, the crash would not have occurred. The Court will therefore dismiss Plaintiffs' substantive due process claim against Coleman.[3]

iii.    Equal Protection (Count IX)

"The Equal Protection Clause requires that 'all persons similarly situated . . . be treated alike.'" Rocket Learning, Inc. v. Rivera-Sanchez, 715 F.3d 1, 10 (1st Cir. 2013) (quoting City of

---

[3] For substantially the same reasons, the Court will also dismiss Plaintiffs' due process claim against Coleman to the extent it relies on the procedural guarantees of the Due Process Clause. To state a procedural due process claim, a plaintiff must allege that the defendant has "deprived [him] of some protected liberty or property interest." Roe v. Lynch, 997 F.3d 80, 85 (1st Cir.

Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985)).  To allege an equal protection violation, a plaintiff must allege differential treatment compared to someone who is similarly situated.  Koelsch v. Town of Amesbury, 851 F. Supp. 497, 501 (D. Mass. 1994) (quoting Jacobs, Visconsi & Jacobs, Co. v. City of Lawrence, 927 F.2d 1111, 1118 (10th Cir. 1991)) ("A violation of equal protection occurs when the government treats someone differently than another who is similarly situated.").  "[S]ome '[p]roof of . . . discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." Calvary Chapel Belfast v. Univ. of Me. Sys., 180 F.4th 13, 26 (1st Cir. 2026) (citing Village of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 265–66 (1977)).

Plaintiffs allege that the officers' high-speed pursuit and their alleged mishandling of the investigation following the car crash was "racially motivated."  [Compl. ¶ 120].  Coleman argues that Plaintiffs' equal-protection claim fails because she was unaware of the race of the occupants of the vehicle when she joined in pursuit.  [ECF No. 24 at 7–8].  Plaintiffs respond that, regardless of Coleman's "intent or knowledge," she joined the pursuit without any reasonable suspicion of wrongdoing, and her participation was therefore the product of "unlawful racial profiling."  [ECF No. 27 at 7].

Here, because Plaintiffs have not alleged that Coleman was aware of the decedent's race or any other protected characteristic, their allegations do not plausibly suggest that Coleman acted with a "discriminatory intent or purpose."  See Calvary Chapel Belfast, 180 F.4th at 26. Although Plaintiffs allege that Farley and Champagnie conducted the initial stop without legal

_____

2021).  Without an adequately alleged causal link between Coleman and the alleged deprivation in this case—Winslow's death—Plaintiffs do not state a procedural due process claim.

13

justification and based on "bigoted assumptions," [Compl. ¶ 122], they do not allege that Coleman was involved in that initial stop, asserting only that Coleman "follow[ed] [Farley and Champagnie's] unmarked unit" in her marked police car after the Hyundai began to drive away, [id. ¶ 28]. Plaintiffs contend that they are "not required to show that every officer involved personally observed the occupants" or knew of their race to "allege an incident of racially discriminatory policing." [ECF No. 27 at 7]. To state a claim against Coleman, however, Plaintiffs must do more than allege her involvement in an "incident of racially discriminatory policing." [Id.]. Without being aware of the decedent's race, Coleman could not have acted with the "discriminatory intent or purpose" necessary to violate the Equal Protection Clause. Calvary Chapel, 180 F.4th at 26. Because Plaintiffs have offered no allegations establishing or plausibly suggesting such an awareness, the Court will dismiss Plaintiffs' equal protection claim against Coleman.

### 2.    Intentional Infliction of Emotional Distress (Count IV)

Coleman also seeks dismissal of Plaintiffs' claim against her for intentional infliction of emotional distress. To state a claim for intentional infliction of emotional distress under Massachusetts law, a plaintiff must show: "(1) that the defendant intended to cause, or should have known that his conduct would cause, emotional distress; (2) that the defendant's conduct was extreme and outrageous; (3) that the defendant's conduct caused the plaintiff's distress; and (4) that the plaintiff suffered severe distress." Kerrissey v. Bruce, No. 21-cv-11277, 2026 WL 883777, at *8 (D. Mass. Mar. 31, 2026) (citing Sena v. Commonwealth, 629 N.E.2d 986, 994 (Mass. 1994)). To be "extreme and outrageous," conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Young v. Wells Fargo Bank, N.A.,

14

717 F.3d 224, 240 (1st Cir. 2013) (quoting Foley v. Polaroid Corp., 508 N.E.2d 72, 82 (Mass. 1987)).

Coleman argues that the actions attributed to her in the Complaint, which she defines as "following the unmarked cruiser" and "ignor[ing] a superior officer's order," do not qualify as sufficiently "extreme and outrageous" to support a claim for intentional infliction of emotional distress. [ECF No. 24 at 5]. Plaintiffs respond that whether Coleman's participation in the "senseless, arbitrary and terrifying" high-speed chase is "extreme and outrageous" is a question of fact. [ECF No. 27 at 5].

Here, the Court need not decide whether Coleman's alleged actions meet the standard for "extreme and outrageous" conduct because, as discussed above, Plaintiffs have failed to plausibly allege a causal link between Coleman's actions and their harm. As in the § 1983 context, establishing tort causation under Massachusetts law ordinarily requires the plaintiff to "show that the 'defendant's conduct was a but-for cause of [its] injury[.]'" Reinhardt v. Gulf Ins. Co., 489 F.3d 405, 412 (1st Cir. 2007) (quoting Jorgensen v. Mass. Port Auth., 905 F.2d 515, 524 (1st Cir. 1990)). The Court understands Plaintiffs' claim for intentional infliction of emotional distress to be premised on their emotional distress from the loss of their son. Because Plaintiffs do not plausibly allege that Coleman was a but-for cause of the crash—or that there were multiple sufficient, independent causes—they cannot plausibly allege that she was a cause of their emotional distress arising from the crash. To the extent Plaintiffs' claim is premised on emotional distress arising from the conduct of Boston Police Department employees after the crash, Plaintiffs do not offer any allegations of individual conduct by Coleman in relation to

those events.  The Court will therefore dismiss Plaintiffs' claim for intentional infliction of emotional distress against Coleman.

### B.    Claims Against the City

The City moves to dismiss Plaintiffs' claims for intentional infliction of emotional distress (Count IV), loss of consortium (Count VI), and their constitutional claims (Counts VII–IX).  Plaintiffs do not offer an argument as to why the Court should not dismiss their claims for intentional infliction of emotional distress or loss of consortium, so the Court will focus on their constitutional claims.[4]

The City argues that the Plaintiffs' § 1983 claims fail because (1) Plaintiffs have not pled the existence of an "unconstitutional policy, practice, or custom" that caused the underlying constitutional violations under Monell v. Dep't of Soc. Servs. of New York, 436 U.S. 658 (1978), and (2) the officers' alleged conduct does not violate the Fourth or Fourteenth Amendments.  [ECF No. 11 at 1–2].  In response, Plaintiffs argue that the City repeated failed "to discipline or remove officers with known [Internal Affairs] complaints and/or pending investigations," and that such failure "constitutes a custom of inadequate supervision" that is responsible for the alleged constitutional violation.  [ECF No. 17 at 5–6].  Plaintiffs further argue

---

[4] While Plaintiffs request that the Court deny the City's motion to dismiss their claim for loss of consortium (Count VI), their opposition does not rebut the City's argument that the Massachusetts loss of consortium statute, Mass. Gen. Laws ch. 231, § 85X, does not apply to municipalities. The Plaintiffs' opposition also fails to oppose or address the City's motion to dismiss Count IV (intentional infliction of emotional distress).  As "failure to oppose [an] argument amounts to a waiver of any objection to it," the Court deems Counts VI and IV abandoned.  Peterson v. E. Bos. Sav. Bank, No. 17-cv-11776, 2018 WL 4696746, at *2 (D. Mass. Sep. 29, 2018) (citations omitted); see also Mahoney v. Found. Med., Inc., 342 F. Supp. 3d 206, 217 (D. Mass. 2018) (citation omitted) (finding claim waived where plaintiff's opposition to motion to dismiss failed to respond to defendant's argument); Perkins v. City of Attleboro, 969 F. Supp. 2d 158, 177 (D. Mass. 2013) (same).

that the officers violated (1) the Fourth Amendment by performing a traffic stop without reasonable suspicion, and (2) the Due Process Clause of the Fourteenth Amendment by engaging in a prohibited high-speed chase that "shocks the conscience." [Id. at 6–8].

At this juncture, the Court need not decide whether Champagnie's and Farley's alleged conduct violated the Fourth or Fourteenth Amendments, and expresses no opinion as to those issues, as each of Plaintiffs' constitutional claims against the City fails under the municipal liability principles set out in Monell. See 436 U.S. 658. Under Monell, "[m]unicipalities 'are responsible only for their own unconstitutional acts,' and 'are not vicariously liable . . . for the actions of their non-policymaking employees.'" Cosenza v. City of Worcester, 120 F.4th 30, 38 (1st Cir. 2024) (quoting Bannon v. Godin, 99 F.4th 63, 88 (1st Cir. 2024)). Thus, a plaintiff who brings a § 1983 action against a municipality bears the burden of showing that, 'through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged.'" Haley v. City of Bos., 657 F.3d 39, 51 (1st Cir. 2011) (quoting Bd. of Cnty. Comm'rs v. Brown, 520 U.S. 397, 404 (1997)). Accordingly, to make out a Monell claim, the plaintiff must show that: "(1) the action in question constituted a 'policy' or 'custom' attributable to the municipality . . . (2) the policy or custom 'actually caused' the constitutional injury . . . and (3) the municipality acted with a degree of fault that amounts to 'deliberate indifference to the rights of persons with whom the police come into contact.'" Conlon v. Scaltreto, 158 F.4th 211, 223 (1st Cir. 2025) (first quoting Young v. City of Providence ex rel. Napolitano, 404 F.3d 4, 26 (1st Cir. 2005); and then quoting City of Canton v. Harris, 489 U.S. 378, 388–89 (1989)). Plaintiffs' Monell claims

17

fail because they have not shown either the existence of a policy or custom, or a causal connection with their injuries.

### 1.      Existence of a Policy or Custom

The first requirement under Monell is that the Plaintiff show the existence of a custom or policy attributable to the municipality.  "The First Circuit has explained the difference between official policy and unofficial custom: '[u]nlike a policy, which comes into existence because of the top-down affirmative decision of a policymaker, a custom develops from the bottom-up.'" Alston v. Town of Brookline, 308 F. Supp. 3d 509, 533 (D. Mass. 2018) (quoting Baron v. Suffolk Cnty. Sheriff's Dep't, 402 F.3d 225, 236 (1st Cir. 2005)).  "When a plaintiff points to no specific unconstitutional policy . . . a claim of municipal liability must be grounded in a custom as evidenced by widespread action or inaction by public officials." Id.  Here, Plaintiffs do not allege any "top-down affirmative decision of a policymaker," so their complaint must be grounded in a municipal "custom as evidenced by widespread action or inaction." Id.

Plaintiffs base their claims of municipal liability on the theory that the City had a custom of failing to supervise or discipline officers.  [ECF No. 17 at 4–6].  Specifically, Plaintiffs argue that they have adequately alleged the City's "repeated failure to discipline or remove officers with known [Internal Affairs] complaints," [id. at 5], and "a widespread practice of non-enforcement of the Boston Police Department policy," [id. at 6].  Failure-to-supervise claims are subject to a "stringent standard." Mazza v. City of Bos., 753 F. Supp. 3d 88, 96 (D. Mass. 2024), recons. den., 780 F. Supp. 3d 325 (D. Mass. 2025).  "In order to establish liability under a failure to discipline theory, the Plaintiff must show a persistent failure to discipline." Barker v. City of Bos., 795 F. Supp. 2d 117, 124 (D. Mass. 2011).  "A single failure to discipline is not sufficient to establish municipal liability under Monell," id., and "[a]llegations of one's own

injury, unmoored from a pattern of conduct by the municipality . . . cannot support a <u>Monell</u> claim on a theory of failure either to train or supervise," <u>Mazza</u>, 753 F. Supp. 3d at 96.  Rather, a municipality's failure to supervise, as with any municipal custom, "must be so well settled and widespread that the policymaking officials of the municipality can be said to have either actual or constructive knowledge of it yet did nothing to end the practice."  <u>Alston</u>, 308 F. Supp. 3d at 533 (quoting <u>Bordanaro v. McLeod</u>, 871 F.2d 1151, 1156 (1st Cir. 1989)).

Plaintiffs' non-conclusory allegations do not plausibly meet the stringent standard for establishing a custom of failing to discipline or supervise officers.  Plaintiffs allege only two facts predating the incident that they argue establish a pattern of non-enforcement and failure to discipline officers who violate departmental policies.  First, Plaintiffs allege that Champagnie was investigated for "accidentally discharging his firearm through a neighbor's wall."  [Compl. ¶ 48].  Second, Plaintiffs allege that "Officer Champagnie has at least one complaint for an illegal search."  [<u>Id.</u> ¶ 49].  Plaintiffs do not allege any facts regarding departmental policies that Champagnie allegedly violated through these incidents, or any facts regarding discipline Champagnie did or did not receive in connection with them, other than that he was on active duty at the time of the incident and "was listed on the eligibility list for the Massachusetts State Police as recently as September of 2024."  [<u>Id.</u> ¶ 50].  Nor do Plaintiffs allege any facts regarding the City's supervision or discipline (or lack thereof) of any officers other than Champagnie.  Given their sparsity and the lack of a consistent thread between them, Plaintiffs' allegations do not plausibly establish the type of department-wide, "settled and widespread" custom, <u>Alston</u>, 308 F. Supp. 3d at 533, that is necessary to state a claim under <u>Monell</u>.  <u>See, e.g.</u>, <u>Xian Ming Wu v. City of New Bedford</u>, No. 12-cv-11648, 2013 WL 4858473, at *3–4 (D. Mass. Sep. 11, 2013) (finding "[t]he mere existence of . . . two unsubstantiated complaints," plus plaintiff's

19

"allegations about the single incident that he suffered," insufficient to plausibly establish custom under Monell).

### 2.    Causation

The second requirement of a Monell claim is that "the municipal policy or custom actually have caused the plaintiff's injury." City of Providence ex rel. Napolitano, 404 F.3d at 26. This necessitates a sufficient nexus between the policy or custom alleged and the constitutional deprivation that the plaintiff suffered: it "must be so tied to the challenged acts that it can be said to be the moving force of the constitutional violation." Distefano v. Cornelius, 822 F. Supp. 3d 208, 221 (D. Mass. 2026) (quoting Freeman v. Town of Hudson, 849 F. Supp. 2d 138, 149 (D. Mass. 2012)). "Courts have required that the evidence used to demonstrate a municipal custom have a close connection to the acts alleged in the case itself." Alston, 308 F. Supp. 3d at 534.

Here, even if Plaintiffs had set forth factual allegations plausibly suggesting the existence of a municipal custom, they have failed to plausibly allege a sufficient connection between any past failures and the alleged violations at issue in this case. The allegedly unconstitutional actions Plaintiffs assert here are (1) the officers' decision to perform a traffic stop without reasonable suspicion (in alleged violation of the Fourth Amendment), (2) the officers' racial profiling of the decedent (in alleged violation of the Equal Protection Clause), and (3) the officers' decision to engage in a high-speed pursuit despite a contradictory order from their supervisor (in alleged violation of the Due Process Clause). [Compl. ¶¶ 101–23]. None of these alleged acts bear any apparent connection to the past disciplinary failures Plaintiffs allege,

20

however, which solely involved the improper firing of a weapon and an allegedly illegal search. [Id. ¶¶ 48–49].

Plaintiffs argue that the City's alleged custom of failing to discipline officers was the cause of the alleged constitutional violations here because, "but for the officers' confidence that supervisory orders and policy could be ignored without consequence, the high-speed chase in an unmarked cruiser never would have continued." [ECF No. 17 at 6]. Plaintiffs' factual allegations, however, do not provide enough support to make this conclusion plausible, even construed in the light most favorable to them. They do not identify circumstances that would suggest to a reasonable officer that "supervisory orders and policy" could be "ignored without consequence," much less circumstances indicating that the specific types of orders and policies involved in this case—concerning high-speed pursuits, reasonable suspicion, and racial profiling—could be ignored. Thus, even assuming arguendo that the past actions alleged were widespread or persistent enough to constitute a municipal custom, the Court could not conclude that they were the "moving force" behind the alleged constitutional violations in this case. See Distefano, 822 F. Supp. 3d at 221. Accordingly, the Court will dismiss Plaintiffs' constitutional claims against the City.

## IV.     CONCLUSION

For the foregoing reasons, Coleman's motion to dismiss counts I, III, IV, V, VI, VII, VIII, and IX against her and the City's motion to dismiss counts IV, VI, VII, VIII, and IX against it are both **GRANTED**. The dismissal of Plaintiffs' claims is without prejudice and with leave to file an amended complaint within fourteen days of this order. The Court encourages Plaintiffs to

be thoughtful about which claims they choose to replead, and to replead only claims for which

they can cure the deficiencies identified in this Order.

**SO ORDERED.**

August 10, 2026                                         */s/ Allison D. Burroughs*
                                                        ALLISON D. BURROUGHS
                                                        U.S. DISTRICT JUDGE